**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ADVANCED TEAM CONCEPTS, INC.** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | **No. 02-l97C** |
| **v.** | **)** | **(Senior Judge Smith)** |
| | **)** | |
| **UNITED STATES,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF**
**SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT ON DAMAGES**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, the Court's Order filed October 27, 2005, and the arguments and authorities herein, plaintiff Advanced Team concepts, Inc. ("ATC") files Plaintiff's Reply Memorandum in Support of Supplemental Motion for Summary Judgment on Damages against Leadership Development Center, Immigration & Naturalization Service, Department of Justice ("LDC"), as follows:

**I.**

**PRELIMINARY STATEMENT**

The parties' damages summary judgment dispute is fairly well-framed for decision. Broadly stated, there are two issues: ***First***, whether the Court's "contract versus no-contract" demarcation is bounded strictly by the fiscal year calendar, or by the passing of authority from Director Lee to Director Langton?; ***Second***, whether ATC has met its summary judgment evidentiary burden on damages? Both issues should be resolved in ATC's favor.

## II.

## REPLY ARGUMENTS

At this point, the Court and the parties are fully apprised of the law and the facts. What remains is to understand the facts, and to apply legal reasoning.

### A. The "Contract *versus* No-Contract" Demarcation.

At issue is whether the final course sections offered to ATC by Director Lee fall within the parties' contract period. Stated differently, it is unclear to ATC whether in its Order filed September 28, 2005 the Court intended to divide things strictly according to fiscal years or, rather, according to LDC's human change in leadership from Director Lee to Director Langton.

#### 1. Focussed Chronology.

Director Lee had authority to contract until she retired from government service on November 3, 2000.[1] Five months before retirement, by email dated July 6, 2000, she informed Meeker, "I am scheduling dates for October-December 2001", and proposed specific courses, on specific dates, specifically for ATC, and asked Meeker if these worked.[2] ATC accepted.[3] At that point, ATC's sections for "October-December 2001" were fixed (subject to historic business flexibility).

A year later, and only three months before Q1 FY2002, by email sent June 27, 2001, Director

---

[1]Opinion and Order, filed September 28, 2005 (authority to contract); Lee trans. p.5, P. App. I 273 (Dir. Lee retired November 3, 2000).

[2]Lee trans., Exhibit 1, P. App. I 362 (October-December 2001 was LDC's first quarter of fiscal year 2002, denoted "Q1 FY2002").

[3]Meeker trans., p. 109-110, Pl. App. I 144-145, and Meeker trans. Exhibit 6 (email from Lee, to ATC, dated July 6, 2000, scheduling ATC for ten sections during October 22 through December 7, 2001), Pl. App. I 258.

Langton gave his first indication of changes that would "potentially result in changes to content and how courses are delivered."[4] Langton's potential change became an actual change -- the full termination of ATC -- on September 14, 2001, just two weeks before Q1 FY2002 began.[5]

ATC's efforts to obtain reinstatement and to find replacement work were unsuccessful.[6] At best it was able to avoid its direct disbursements to instructors for classes actually taught.

**2. Argument.**

Director Lee's email dated July 6, 2000 proposed specific courses on specific dates, specifically for ATC, for the period "October-December 2001", which ATC accepted. Thus, Director Lee's scheduling email to ATC carved out Q1 FY2002 from the balance of that fiscal year. On retirement she left the rest of FY2002 for her successor.

In turn, Director Langton ascended, and terminated ATC from the sections Director Lee previously scheduled.

The Court's previous order reasons that Director Lee contracted with ATC, although Director Langton did not. That temporal demarcation is based on a human change in contracting authority. The Court's specific ruling, however, divides time according to a fiscal year calendar change, which does not actually dovetail with its reasoning. Accordingly, ATC submits that, following the Court's reasoning, the Court intended to include "October-December 2001" in ATC's contract period.

---

[4]Langton trans. Ex. 1, P. App. I 435.

[5]Meeker trans. p. 64; Langton trans. p 39-40.

[6]Meeker trans. p. 131-141; ATC second interrogatory resp. No. 16 (listing in detail ATC's minimal replacement work, and the LDC work that could not be replaced). Meeker was able to secure one day plus one and one half hours of other work, although this work would have been done by ATC in addition to teaching LDC's schedules and, as such, was not "replacement" work. Meeker trans. 136 ("Would ATC have been able to perform for that other contract as well? Yes.").

**B. <u>Plaintiff's Damages Summary Judgment Evidence.</u>**

The Government argues that ATC could have provided more depth and detail in support of its damages. Frankly, as set out below, again, ATC's numbers are what they are, and they are sufficient summary judgment evidence. Conspicuously, moreover, the Government does not assert that it can not itself derive these same numbers from ATC's document production, written discovery responses, and Meeker's deposition. Rather, except for two tax returns (discussed below) the Government proffers no controverting summary judgment evidence at all. In this adversarial context that truly is telling.

**1. <u>Previous Briefing and Conferences.</u>**

As ATC previously asserted, when it was terminated from LDC, Meeker and his cadre intensely sought mitigation, at full throttle, without success.[7] From a "real resources" economic perspective, there simply were no savings. That is why ATC argued, and indeed still contends, that Restatement (Second) of Contracts § 350 applies and that, therefore, ATC should recover revenue damages.[8] Accordingly, ATC's "top line" revenue losses, correlated by course names, number of sections lost, dollar amounts, and course dates, were presented at every turn, starting with ATC's demand, then in its complaint, in response to interrogatories, and in its several summary judgment

---

[7]*Supra*, note 6, sources cited therein, and accompanying text.

[8]Restatement (Second) of Contracts § 350 ("Avoidability As A Limitation On Damages"), states:

> (1) Except as stated in Subsection (2), damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation.
>
> (2) The injured party is not precluded from recovery by the rule stated in Subsection (1) to the extent that he has made reasonable but unsuccessful efforts to avoid loss.

papers. Indeed, these amounts are not even disputed.

Yet, the Court indicated in its conferences with counsel that ATC should net off the amounts it would have paid its cadre for any sections that were lost in breach of contract. That is precisely what was done in ATC's supplemental damages motion, and specifically in Meeker's verification and the table attached to it.[9] As Meeker explains in his verification, ATC's only "costs avoided" were "the amounts ATC would have paid its instructors had these sections been taught."[10] These amounts are set out with specificity in Meeker's verification, and were produced to the Government in discovery.[11]

As regards Meeker himself, his verification is equally explanatory, and clear: There were no costs avoided.[12] Unlike his cadre, Meeker did not receive payments for teaching, he was merely ATC's president and residual claimant.[13] Although he redoubled efforts toward mitigation when ATC's contract was breached, those efforts went uncompensated and did not result in replacement cash.[14]

---

[9]Verification of Larry Meeker, filed January 19, 2007, as Exhibit"H" appended to Plaintiff's Supplemental Motion for Summary Judgment on Damages, including a table of calculations of ATC's damages net of any "costs avoided" by ATC.

[10]*Id*.

[11]*Id*.

[12]*Id*.

[13]*Id*.

[14]*Id*.

**2. <u>ATC's Tax Returns Are Inadmissible, and Not Probative.</u>**

The Government attached two of ATC's tax returns to its response brief, without any authentication that might make them admissible. For that threshold reason alone they are inadmissible as summary judgment evidence. Beyond that, the Government merely effectively declares "Lookie here!", and then leaves it for the Court to try to figure out what these documents are supposed to mean in relation to this case. That it may not do for, *inter alia*, the following reasons.[15]

***First***, in its brief the Government states that ATC asserts in this case "that it reduced salaries by only \$46,200.00, while its tax filings show a reduction in overall salaries in 2000 and 2001 of \$160,136.00." Nowhere in this case, however, does ATC assert that it reduced salaries by only \$46,200.00. That is simply a fabrication. What ATC does state, and all that it states, is that in a strictly accounting sense ATC avoided instructor payments of \$46,200.00 for classes canceled in breach of its contract.

***Second***, the "apples and oranges" character of tax returns versus economic damages is self-evident. Tax returns are prepared pursuant to IRS definitions and regulations to determine taxes. Economic damages net of costs avoided are calculated according to very different rules to answer an all together different inquiry.

***Third***, the Government offers no analysis of the tax returns at all. Instead, having only one puzzle piece, avoided costs of \$46,200.00, the Government invites the Court to examine ATC's tax

[15]The Court also should be concerned that the Government filed a non-party's name, address, telephone number, and Social Security number in a now publicly available paper, thus exposing this individual to identity theft. Beyond bringing this to the Court's attention, ATC does not know what needs to be done about it.

returns and surmise for itself how ATC was able to pay its employees relatively handsomely during 2000, but not during 2001. ATC's tax returns are not on trial here, and it is not ATC's burden to divulge here how it determined employee salaries (and perhaps bonuses) in 2000, or to explain employee salaries that were earned but went unpaid in 2001.

Taken together, ATC's tax returns are not summary judgment evidence. Rather, they should be stricken, and unfiled.

**III.**

**SUMMARY AND CONCLUSIONS**

For the foregoing reasons, the Court should grant summary judgment in ATC's favor, in the following amounts:

| LDC's Fiscal Quarter: | Q1 2001 | Q2 2001 | Q3 2001 | Q4 2001 | Q1 2002 |
|---|---|---|---|---|---|
| Lost Revenue | $32,000 | $30,000 | $52,000 | $104,000 | $88,000 |
| Costs Avoided | $ 7,000 | $ 3,500 | $12,600 | $ 14,000 | $16,100 |
| Difference | $25,000 | $26,500 | $39,400 | $90,000 | $71,900 |
| Total Damages | $252,800.00. | | | | |

Respectfully submitted,

**Charles H. Steen, P.C.**

Date: March 9, 2007 By: /s Charles H. Steen

Charles H. Steen
Texas Bar No. 00785040
The White House on Turtle Creek
2401 Turtle Creek Blvd.
Dallas, Texas 75219
Telephone: (214) 559-4446
Telecopier: (214) 559-4423

**ATTORNEY FOR PLAINTIFF ADVANCED TEAM CONCEPTS**

**CERTIFICATE OF SERVICE**

I certify that I have caused a true and correct copy of the above and foregoing Plaintiff's Reply Memorandum in Support of Supplemental Motion for Summary Judgment on Damages to be served upon defendant, by and through its attorney of record, Steven Mager, Esq., Commercial Litigation Branch, Civil Division, Department of Justice, 1100 L Street, N.W., Attn: Classification Unit, 8th Floor, Washington, D.C., 20530, via first class mail, and via telecopier to (202) 305-7643, on January 19, 2007.

/s Charles H. Steen
Charles H. Steen