**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ADVANCED TEAM CONCEPTS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Cause No. 02-197C** |
| **v.** | ) | **(Senior Judge Smith)** |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ATC'S REPLY IN SUPPORT OF SECOND MOTION FOR SUMMARY JUDGMENT ON DAMAGES**

Pursuant to the Rules of the United States Court of Federal Claims, plaintiff Advanced Team Concepts, Inc. files ATC's Reply in Support of Second Motion for Summary Judgment on Damages, as follows:

## I. PRELIMINARY STATEMENT

At this point the Court has what there is to know for summary judgment purposes. Two ethics issues are raised in the Government's response, however, which require a serious reply. Beyond that, there is very little to add.

## II. REPLY ARGUMENTS

### A. Advocacy *versus* Evidence: Steen is ATC's Advocate, Not an "Undisclosed Expert".

#### 1. Advocates and Experts Distinguished.

Attorneys are advocates. That, very ultimately, is the essence of what we do. We shape and configure and argue. We try to be persuasive. Experts are different, they proffer opinion evidence. Although these may sometimes be similar, advocacy and expert opinion are not the same.

To be an expert one must be qualified on a particular subject, in a particular case, following *Daubert*. Once qualified, an expert may opine. In contrast, to be an advocate, one must be admitted to practice. Once admitted, an attorney's license, his purpose, is advocacy. Steen is admitted to practice, in this Court, thus making advocacy his license, and *raison d'etre*. No rule of law, moreover, requires or even suggests, that an attorney must leave his education, scholarship, or academic credentials outside the Courtroom. Rather, if these are potentially helpful to the case, if these can strengthen his advocacy, he should bring them. Indeed, to be known as "learned" is high praise. From there, the Court is completely capable of deciding which arguments are compelling, and which are not.

**2. <u>Economics as Bona Fide Advocacy.</u>**

Over the past forty years, economics, more than any other Nobel discipline, has been embraced by legal scholarship, and by the law itself, for one reason: It is helpful. Done well, it is indistinguishable from a step-wise walk down avenues of logic and common experience. Nowadays, attorneys, legal scholars, and many prominent Judges, including Calabresi, Bork, Posner, and Easterbrook, to name only a few, themselves regularly employ economic thinking to understand and advocate factual perspectives, and the law itself, without ever becoming "experts".[1]

---

[1]*See, e.g.*, Richard A. Posner and Frank H. Easterbrook, *Antitrust, Cases, Economic Notes, and Other Materials*, West Publishing 1981. At the time of publication, both men were faculty at the University of Chicago Law School. Hon. Richard A. Posner is now a judge on the United States Court of Appeals for the Seventh Circuit, and served as its Chief Judge from 1993 to 2000. Judge Posner is a major voice in the law and economics movement, which he helped start at the University of Chicago Law School. Hon. Frank H. Easterbrook became Chief Judge of the United States Court of Appeals for the Seventh Circuit in November 2006, after joining the Court in 1985. Easterbrook is noted for his use of economic analysis of law, his legalist approach to judicial interpretation, for his clear writing style, and for being one of the most prolific judges of his generation. Hon. Guido Calabresi, with Douglas Melamed, authored *Property Rules, Liability Rules and Inalienability: One View of the Cathedral*, 85 Harv. L. Rev. 1089 (1972). Calabresi is, along with Virginia's Ronald

Economics, moreover, is not a cloistered order, or a secret society. It is way of thinking. In turn, it is oftentimes an effective way to understand legal facts and issues, and that -- without question -- is why it is used prominently in all the top-ranked law schools.

Although law and economics are not in all ways congruent, well-considered economics makes for sound, thoughtful, logical, and reasoned advocacy. Economic advocacy is offered here for its persuasiveness, for consideration, as a way of understanding facts and law. The text to which the Government objects is advocacy, not evidence.

**3. Economic Advocacy in ATC's Briefing.**

In ATC's brief Steen unabashedly used economic exposition to advocate ATC's facts. Steen's advocacy, of course, ultimately must stand or fall according to its own persuasive merit. But the raw, overt economic character of Steen's advocacy deserves an answer to the question: Where did that come from? There is no single source to be cited -- from either the legal or economic literatures -- for the specific conceptual structure Steen urged. So, Steen answered the question anticipatorily, by providing information about his education and scholarship, as a shorthand way of stating, "Your Honor, I've actually given a lot of time and formal thought to this. Hopefully it makes some sense."

---

Coase and others, considered a founder of Law & Economics. His pioneering contributions to the field include the application of economic reasoning to tort law, and a legal interpretation of the Coase theorem. Calabresi has been a Yale law professor since 1959, and was Dean of Yale Law School from 1985 to 1994. It was under Calabresi's intellectual leadership that Yale Law School became a leading center for legal scholarship imbued with economics. In 1994 Prof. Calabresi joined the U.S. Court of Appeals for the Second Circuit. Robert H. Bork. *The Antitrust Paradox*, New York: Free Press. (1978). *See also*, Dean Henry Manne, considered a founder of the Law & Economics discipline, is Professor Emeritus of George Mason University.

Other examples of lawyers, Courts -- and, indeed, the Government itself -- employing economics to explain law and facts are far-and-away too numerous to list.

Steen did intend, of course, for his academic worth to give the Court a measure of comfort that his advocacy is actually well-considered, not a fantasy plucked from the sky. It says something for the Court about the lawyer, as would knowing about clerkships, his law school, or his firm. There being no proscription, or suggestion, against informing the Court of his doctoral education, teaching appointments, or publications, Steen sought to answer for the Court: What informs this lawyer's overtly economic argument? Steen's credentials are either useful to the Court, or irrelevant; but they are in no way prejudicial to the Government. The Court will find that Steen's argument either is persuasive, or not.

**4. <u>What to Do, if Anything?</u>**

The Government's "undisclosed expert" objection derives from the fact that Steen recited some of his credentials, not from the body of the argument itself. Accordingly, should the Court find that there is a *faux-pas* in ATC's paper, the remedy should be to strike Steen's credentials from consideration, and perhaps to interlineate the following: *See generally*, Richard A. Posner, *Economic Analysis of Law*, 7th ed. (Aspen Law & Business 2007).

**B. <u>The Jennifer Lee Declaration is Okay.</u>**

**1. <u>The Government Can Not Have It Both Ways.</u>**

The exhibits proffered by the Government simply do not flesh out the full story about Dir. Lee's representation.[2] From the beginning of this case ATC knew Dir. Lee would be an important witness, and that it would need her deposition. Steen Decl., ¶3.

In trying to set up Dir. Lee's deposition, ATC's counsel, Steen, conducted several calls with

---

[2]Attorney Declaration of Charles H. Steen, "Steen Decl., ¶3", filed herewith as Exhibit "J", together with the sources cited therein from the Government's appendix denoted "Def. 2nd Supp. App. __".

DOJ attorney Dorrie Finnerman, trying to determine whether someone from the Government would represent Lee. Steen Decl., ¶4. A concise answer was simply not forthcoming. *Id*. Rather, Finnerman repeatedly informed Steen that a decision had not yet been made because of: (1) ordinary institutional slowness; and (2) a potential conflict of interest. *Id*. For several weeks Finnerman simply "sat on the fence" about Lee's representation, effectively trying to have it both ways. *Id*.

In early November 2002, Finnerman informed Steen by telephone that she probably would represent Dir. Lee at her deposition, but that a decision still had not been made about whether the Government would, or could, represent Dir. Lee after that. Steen Decl., ¶5. The problem was that the Government was in a conflicted position. *Id*. On the one hand, Dir. Lee, as a former LDC director, was nominally entitled to representation. *Id*. On the other hand, it was becoming clear that the Government's defense would require throwing Dir. Lee under the proverbial bus. *Id*. More specifically, to vindicate Dir. Langton's conduct in terminating ATC the Government would have to assert that Dir. Lee's conduct was unauthorized, even though Dir. Lee would testify that she was authorized to contract with ATC. *Id*.

ATC forced the issue by serving its subpoena on Dir. Lee on November 7, 2002, by and through Finnerman, setting the deposition for December 9, 2002, at Steen's offices in Dallas, Texas. Steen Decl., ¶6. At the time, Finnerman still did not even know how to contact Lee. *Id*. Steen, in turn, provided Lee's contact information to Finnerman via email sent November 17, 2002. *Id*.

By agreement the deposition was eventually set for January 23, 2003, in Florida. Steen Decl., ¶7. At the deposition Finnerman was careful not to make a formal "on the record" notice of her appearance for Dir. Lee. *Id*. Steen did, for ATC, but Finnerman and her colleague Faustino did not. *Id*. ATC, moreover, was certainly never provided with the Government's engagement letter, and

Finnerman, equally certainly, never to this day, filed a "notice of appearance" for Dir. Lee to make the representation clear. *Id*.

After the deposition Finnerman and Steen at least once again discussed Finnerman's now-sharpened actual conflict, and Finnerman was resolved that going forward Dir. Lee should have separate counsel. Steen Decl., ¶8. No attorney to date has noticed appearance for Dir. Lee, however, and ATC has nothing from anyone stating simply, "I represent Jennifer Lee." *Id*. As regards a motion to withdraw, Finnerman said she did not believe one was necessary, but that Dir. Lee should have a chance to decide what she wanted to do. *Id*. Steen and ATC have no knowledge of any subsequent communications between the Government and Dir. Lee although, according to their engagement letter, and first principles, Dir. Lee is entitled to notification of the conflict, and of her right to retain private counsel. *Id*.

Eventually Finnerman went off the litigation papers, and Steven Mager appeared for the Government. Steen Decl., ¶9. Mager has not, however, given notice, or any indication, to Steen that he represents Dir. Lee. *Id*.

Taken together, to Steen and ATC's knowledge and understanding, the Government's limited representation of Dir. Lee was concluded with her deposition. Steen Decl., ¶10. If the Government represents Dir. Lee, or she has separate counsel, Steen and ATC have never been informed of it. *Id*.

**2. <u>Director Lee's Declaration Testimony Will Not Change.</u>**

In the event the Court determines that Dir. Lee's declaration presents a *faux pas*, and decides to strike that paper, the litigants and the Court are left with more to do.

Dir. Lee's testimony that her email to Meeker was intended to offer a final slate of courses to ATC will never change, because it simply is true. That fact can be established either by her

declaration, or at trial. Either way, the evidence will be the same. Indeed, it is a fact to which the Government should simply stipulate. But the Government cannot stipulate, because of the consequences, which brings sharp focus, and full circle, to the conflict. The Government is acutely adverse to Dir. Lee, and that is why Finnerman fuzzied her representation in the first place. Finnerman's fuzziness should not work a penalty against ATC, however, or to the process of getting to the truth.

The above notwithstanding, whatever the Court directs ATC properly to do to establish the fact of Dir. Lee's offer of a final slate of courses, ATC will, of course, comply.

**C. <u>Mitigation of Damages, and Everything Else.</u>**

**1. <u>Mitigation.</u>**

The Government's response continues to insist that it is ATC's burden to prove that no further mitigation was reasonably available. That is upside down. As ATC briefed in its second supplemental motion, mitigation is a defense, on which the Government bears the burden. For examples, if the Government wants to net off avoided costs of gasoline and office supplies, it is the Government's burden to quantify the amounts avoided, not just to assert that ATC did not do so.

Having failed to come forward with any concise evidence of costs that actually were capable of avoidance, ATC is entitled to summary judgment based upon its "top line" revenue losses, minus its cadre costs avoided.

**2. <u>Everything Else.</u>**

It is not clear to ATC what points are meant by the balance of the Government's response. If it is the Government's purpose to show that its contracting rules and devices are complex to the point that no vendor can unravel and use them with certainty, then ATC is convinced. But in this

case, the established reality is that Dir. Lee contracted with ATC, Dir. Langton did not, and that Dir. Langton breached by terminating ATC from sections contracted by Dir. Lee. What remains is to: (1) add up the revenues lost by breach, (2) subtract ATC's stipulated avoided cadre costs; and (3) subtract any avoided costs for which the Government made evidence, which amount is none.

## III.
## SUMMARY AND CONCLUSIONS

Nothing more can be adduced at trial about the parties' facts, or the law, than is already before the Court. Therefore, the Court should grant summary judgment in ATC's favor in the amount calculated again below:

**Eighteen (18) Sections During Academic Year 2001 (October 2000 thru September 2001)**

| Calendar Quarter ↣ | 10-12/2000 | 01-03/2001 | 04-06/2001 | 07-09/2001 |
|---|---|---|---|---|
| Lost Revenue | $32,000.00 | $30,000.00 | $52,000.00 | $104,000.00 |
| Costs Avoided | ($ 7,000.00) | ($ 3,500.00) | ($12,600.00) | ($ 14,000.00) |
| Damages | $25,000.00 | $26,500.00 | $39,400.00 | $90,000.00 |

**Ten (10) Sections During First Quarter Academic Year 2002 (October thru December 2001)**

| Calendar Quarter ↣ | 10-12/2001 |
|---|---|
| Lost Revenue | $88,000.00 |
| Costs Avoided | ($16,100.00) |
| Damages | $71,900.00 |

**Cumulative Total Damages $252,800.00**

Respectfully submitted,

**CHARLES H. STEEN, P.C.**

Date: May 1, 2008

By: /s/ Charles H. Steen

Charles H. Steen
Texas Bar No. 00785040
The White House on Turtle Creek
2401 Turtle Creek Blvd.
Dallas, Texas 75219
Telephone: (214) 559-4446
Telecopier: (214) 559-4423

**ATTORNEY FOR PLAINTIFF ADVANCED TEAM CONCEPTS**

## CERTIFICATE OF SERVICE

I certify that I have caused a true and correct copy of the above and foregoing ATC's Reply in Support of Second Motion for Summary Judgment on Damages to be served upon defendant, by and through its attorney of record, Steven Mager, Esq., Commercial Litigation Branch, Civil Division, Department of Justice, 1100 L Street, N.W., Attn: Classification Unit, 8th Floor, Washington, D.C., 20530, via Federal Express, on May 1, 2008.

/s/ Charles H. Steen
Charles H. Steen

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ADVANCED TEAM CONCEPTS, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 02-l97C** |
| **v.** | ) | **(Senior Judge Smith)** |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ATTORNEY DECLARATION OF CHARLES H. STEEN**

1. My name is Charles H. Steen. I am the attorney for plaintiff Advanced Team Concepts, Inc. in the above-styled matter. The exhibits referenced in this declaration were previously filed by the Government. They were referenced using the form "Def. 2nd Supp. App. __", and the same form is used herein.

2. The facts stated herein are true and correct, and based upon my personal knowledge. These facts are, moreover, a verbatim version of the facts stated in Section II(B)(1) of ATC's Reply in Support of Second Motion for Summary Judgment on Damages. The reason the Reply and this Declaration are the same is because "the facts are the facts".

3. The exhibits proffered by the Government simply do not flesh out the full story about Dir. Lee's representation. From the beginning of this case ATC knew Dir. Lee would be an important witness, and that it would need her deposition.

4. In trying to set up Dir. Lee's deposition, ATC's counsel, Steen, the undersigned, conducted several calls with DOJ attorney Dorrie Finnerman, trying to determine whether someone from the Government would represent Lee. A concise answer was simply not forthcoming. Rather, Finnerman repeatedly informed Steen that a decision had not yet been made because of: (1) ordinary institutional slowness; and (2) a potential conflict of interest. For several weeks Finnerman simply

"sat on the fence" about Lee's representation, effectively trying to have it both ways.

5. In early November 2002, Finnerman informed Steen by telephone that she probably would represent Dir. Lee at her deposition, but that a decision still had not been made about whether the Government would, or could, represent Dir. Lee after that. The problem was that the Government was in a conflicted position. On the one hand, Dir. Lee, as a former LDC director, was nominally entitled to representation. On the other hand, it was becoming clear that the Government's defense would require throwing Dir. Lee under the proverbial bus. More specifically, to vindicate Dir. Langton's conduct in terminating ATC the Government would have to assert that Dir. Lee's conduct was unauthorized, even though Dir. Lee would testify that she was authorized to contract with ATC.

6. ATC forced the issue by serving its subpoena on Dir. Lee on November 7, 2002, by and through Finnerman, setting the deposition for December 9, 2002, at Steen's offices in Dallas, Texas. Def. 2nd Supp. App. 4-7. At the time, Finnerman still did not even know how to contact Lee. Steen, in turn, provided Lee's contact information to Finnerman via email sent November 17, 2002. Def. 2nd Supp. App. 8.

7. By agreement the deposition was eventually set for January 23, 2003, in Florida. At the deposition Finnerman was careful not to make a formal "on the record" notice of her appearance for Dir. Lee. Steen did, for ATC, but Finnerman and her colleague Faustino did not. ATC, moreover, was certainly never provided with the Government's engagement letter, Def. 2nd Supp. App. 1-3, and Finnerman, equally certainly, never to this day, filed a "notice of appearance" for Dir. Lee to make the representation clear.

8. After the deposition Finnerman and Steen at least once again discussed Finnerman's now-sharpened actual conflict, and Finnerman was resolved that going forward Dir. Lee should have

separate counsel. No attorney to date has noticed appearance for Dir. Lee, however, and ATC has nothing from anyone stating simply, "I represent Jennifer Lee." As regards a motion to withdraw, Finnerman said she did not believe one was necessary, but that Dir. Lee should have a chance to decide what she wanted to do. Steen and ATC have no knowledge of any subsequent communications between the Government and Dir. Lee although, according to their engagement letter, and first principles, Dir. Lee is entitled to notification of the conflict, and of her right to retain private counsel.

9. Eventually Finnerman went off the litigation papers, and Steven Mager appeared for the Government. Mager has not, however, given notice, or any indication, to Steen that he represents Dir. Lee.

10. Taken together, to Steen and ATC's knowledge and understanding, the Government's limited representation of Dir. Lee was concluded with her deposition. If the Government represents Dir. Lee, or she has separate counsel, Steen and ATC have never been informed of it.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Signed: May 1, 2008

/s/ Charles H. Steen
Charles H. Steen